**SO ORDERED.**

**SIGNED this 02 day of September, 2010.**

_____
Randy D. Doub
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

IN RE:

WOODY'S ENTERPRISES, INC.                CHAPTER 7
                                         CASE NO. 09-04675-8-RDD
        DEBTOR

ORDER DENYING CONFIRMATION OF
CHAPTER 11 PLAN OF REORGANIZATION

Pending before the Court is the Chapter 11 Plan of Reorganization filed on September 3, 2009 and the Modification of Chapter 11 Plan of Reorganization filed on February 11, 2010 (collectively referred to herein as the "Plan") filed by Woody's Enterprises, Inc. (the "Debtor"), the Objection to the Chapter 11 Plan of Reorganization filed by Gateway Bank & Trust Company ("Gateway") on September 23, 2009 (the "Objection"), and the Bankruptcy Administrator's Response to Debtor's Plan of Reorganization filed on October 26, 2009 (the "Response"). After several continuances, the Court conducted a hearing on the Plan and the responses on August 23 - 24, 2010 in Wilson, North Carolina.

On June 5, 2009, the Debtor filed a voluntary petition for relief under Title 11 of Chapter 11 of the United States Code (the "Bankruptcy Code"). On January 28, 2010, the Court conducted a hearing to consider the initial Chapter 11 Plan of Reorganization filed on September 3, 2009. At

the conclusion of the hearing, the Honorable Stephani W. Humrickhouse, Bankruptcy Judge presiding, denied confirmation, but allowed the Debtor fourteen (14) days to file a substantially amended plan for consideration by the Court.  Subsequently, the Modification of Chapter 11 Plan of Reorganization was filed on February 11, 2010.

The Debtor owns several parcels of real property which secure the obligation to Gateway. These properties are identified as: 6615 Caratoke Highway, Grandy, Currituck County, North Carolina; Lot 50 Soundside Estates, Grandy, Currituck County, North Carolina; and Lots 211 and 215 Grandy Road, Grandy, Currituck County, North Carolina (the "Real Property").  Gateway is the holder of a promissory note and deed of trust, executed by the Debtor on July 27, 2007, in the original principal amount of $2,040,000.00 (the "Note").  The parties agree that the Note is in default.  The balance due under the terms of the Note, as of June 10, 2009 was $2,173,282.29 exclusive of attorneys' fees.[1]  Since the filing of the petition, the Court ordered the Debtor to make an adequate protection payment to Gateway in the amount of $12,708.00 on or before May 31, 2010 at 5:00 p.m. and such payment was timely made by the Debtor.

The Debtor operates a convenience store and fireworks warehouse center in Grandy, North Carolina.[2]  The Store has been in business since 1996 and is operated by Larry Woodhouse, president of the Debtor.  Although the Debtor primarily sells fireworks, its inventory also includes Mexican pottery, knick-knacks, and other sundries.  The Debtor does not have a beer license nor

---

[1] Pursuant to the Plan, the value of the Real Property is $953,100.00.  Neither party presented any evidence as to the value of the Real Property since Gateway elected for treatment under Section 1111(b) of the Bankruptcy Code.  The Court need not reach a decision on whether the proposed Plan terms for payment of Gateway's claim are fair and equitable, as other grounds exist on which to deny confirmation of the Plan.

[2] The store is located at 6615 Caratoke Highway, Grandy, North Carolina (the "Store").

does the Debtor sell lottery tickets.[3] At one time, the Debtor had an agreement with a fuel supplier to sell gasoline and diesel fuel. However, as a result of a proposed sale transaction, the Debtor terminated its fuel agreements. Although the sales transaction failed to close, the Debtor elected not to reinstate its fuel contracts prior to the filing of its petition. As of the confirmation hearing, the Debtor does not have any written contracts or agreements with fuel providers. Mr. Woodhouse stated that he had been working with Lance, a representative from PAPCO Oil, regarding new fuel agreements. However, no term sheet, contract, or corroborating testimony regarding the potential arrangement was provided to the Court.

During the severe weather and storms in November 2009, the Debtor suffered a significant amount of roof damage and loss of inventory because of the winds and rain. Prior to the damage, the Debtor allowed its insurance to lapse and therefore, had to rely upon the forced place insurance purchased by Gateway to cover the cost of the repairs. A dispute amongst the Debtor, Gateway, and the insurance provider arose regarding the damage claim, the selection of a roofing contractor, and the payment of the deductible. During the period of time when the parties were negotiating the claim, the Debtor stated that the roof leaked onto its merchandise whenever it rained. Furthermore, Mr. Woodhouse stated that the Debtor periodically had to close because of leaks in the damaged roof. As a result, the Debtor's inventory was damaged and its revenues were reduced since the Store was closed at times. Ultimately, Gateway arranged for the roof repairs and provided the funds from the insurance proceeds to do so. The repairs were completed in late Spring 2010.

---

[3] It was disclosed to the Court at the confirmation hearing that a company by the name of Laredo's/Laredos (herein referred to as "Laredo's") utilizes space in the Store to sell beer, soft drinks, snacks, and lottery tickets. Based on the testimony at the hearing, Laredo's does not pay rent to the Debtor for use of the space within the Store.

At the hearing, Larry Woodhouse testified that the Debtor suffered operating losses as a result of the roof damage. Furthermore, Mr. Woodhouse represented that the sales and revenues of the Debtor have suffered during the downturn in the economy.  Testimony was offered that the Debtor anticipates that revenues and sales would substantially increase with the proposed construction of two bridges within sixty (60) miles of the Debtor.  Mr. Woodhouse stated that the North Carolina Department of Transportation had recently approved plans for a $629 million construction project for two bridges.  He anticipated that the increase in construction crews and workers would increase merchandise sales, as well as, generate substantial revenues from the sale of gasoline and diesel fuel.  However, Mr. Woodhouse testified that all environmental permits for construction had not yet been obtained.

In addition, Mr. Woodhouse stated that he had conversations with the representatives at the Small Business Association ("SBA") regarding a loan to cover the business losses the Debtor suffered during the November 2009 storms.[4]  However, he stated that the SBA would not approve the loan until a chapter 11 plan of the Debtor has been confirmed.

Mr. Woodhouse testified about the possibility of operating the first laundromat in Curricktuck County.  He stated that, although the planning commission previously rejected the proposal for a laundromat, the board was meeting again on August 23, 2010. He believed the Debtor would have an opportunity to have a laundromat approved.  Mr. Woodhouse believed that since it would be the only laundromat in the area, the revenues would be substantial, which would generate profits.  When questioned as to why he believed that the Debtor would have an inroad to this

---

[4] Judge Humrickhouse stated in her February 3, 2010 Order Denying Confirmation that the Debtor had applied for a loan $130,000.00 from the SBA to repair the buildings and replace damaged inventory.

potentially lucrative business, he stated that he was confident of approval. Mr. Woodhouse stated that he considered leasing the equipment for the laundromat from Tommy Arney, a local businessman with whom Mr. Woodhouse and the Debtor have operated other business ventures. Based on his testimony, it appears that even if the laundromat comes to fruition, much work would be necessary to begin operations. No corroborating evidence was offered to substantiate Mr. Woodhouse's belief that the Debtor would receive the permit. Furthermore, the Debtor failed to present any evidence related to the proposed laundromat at the continuation of the hearing on August 24, 2010, the day after the purported county hearing.

In addition, Mr. Woodhouse stated that upon confirmation of a chapter 11 plan, Laredo's would execute a lease with the Debtor and commence monthly rental payments of $4,000.00 plus 1% of its sales. The Debtor failed to provide a proposed lease agreement, the proposed lease terms, or a representative of Laredo's to confirm the arrangement. Instead, Mr. Woodhouse stated that Laredo's was in a position to make the lease payments and he would ensure that such payments were made. He stated that although he was not a shareholder of Laredo's, Tommy Arney owned the business. Mr. Woodhouse testified that he manages and controls the operation of Laredo's. When questioned as to why there had been no rental payments in the past by Laredo's, Mr. Woodhouse stated that there has been an in-kind contribution by Laredo's, whose customers purchase inventory of the Debtor. Mr. Woodhouse informed the Court that he believed Laredo's generated approximately $25,000.00 in revenue[5] per month. Mr. Woodhouse testified he did not receive a salary or any monies from that enterprise. He stated that Mr. Arney, as a shareholder, has not

---

[5] In addition to selling alcohol and lottery tickets, Laredo's also has a gaming license from which it generates monthly revenues.

recently received distributions from Laredo's operations. Mr. Woodhouse admitted that even with such high revenues, the Debtor pays the costs of all payroll, including the employee salaries that may be employed for the benefit of Laredo's. To date, the Debtor has not been reimbursed for such expenses.

On cross-examination, David Warren, counsel for Gateway, questioned Mr. Woodhouse regarding the operations and profitability of the Debtor since July 2009. This inquiry established that sales had not improved. The Court recognizes the difficulty the Debtor may have suffered related to the storm damage, but the Debtor's actual sales revenue is far below its monthly projected sales figures for the next year.[6] Based on the profit/loss statements attached to the June 2010 Monthly Operating Report filed by the Debtor, sales were $32,536.78. In July 2010, the Debtor generated sales in the amount of $31,953.31.

The Debtor also anticipates generating rental income from three real property leases. To date, no leases have been executed.

Section 1129(a)(1) provides that a court shall confirm a plan only if the plan complies with the applicable provisions of this title. Section 1129(a)(11) of the Bankruptcy Code requires that in order for a plan to be confirmed, "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This

---

[6] Based on the projections submitted to the Court by the Debtor, the Debtor projected sales over the next twelve months to be $690,000.00, including sales of $55,000.00 in September 2010; $45,000.00 in October 2010; $45,000.00 in November 2010; $45,000.00 in December 2010; $45,000.00 in January 2011; $50,000.00 in February 2011; $50,000.00 in March 2011; $60,000.00 in April 2011; $60,000.00 in May 2011; $65,000.00 in June 2011; $90,000.00 in July 2011; and $80,000.00 in August 2011.

requirement is often called the feasibility requirement. *In re A.H. Robins, Co., Inc.,* 880 F.2d 694, 698 (4th Cir. 1989). The question of feasibility is a question of fact in which the debtor bears the burden to show feasibility of the plan by a preponderance of the evidence. *In re Radco,* Case No. 08-03611-8-RDD (Doub, C.J.)(Bankr. E.D.N.C. March 9, 2009)(citing *In re Investment Co. of Southwest, Inc. (F.H. Partners, L.P. v. Investment Co. of Southwest, Inc., et al.),* 341 B.R. 298, 310 (B.A.P. 10th Cir. 2006)). Feasibility is "firmly rooted in predictions based on objective fact." *Radco,* Case No. 08-03611-8-RDD (Doub, C.J.)(Bankr. E.D.N.C. March 9, 2009)(quoting *In re Cheatham*, 78 B.R. 104, 109 (Bankr. E.D.N.C. 1987) and *In re Investment*, 341 B.R. at 310).

*In re Piece Goods Shops Company, L.P./Piece Goods Shops Corp.*, the Bankruptcy Court for the Middle District of North Carolina set forth factors a court may consider in assessing feasibility. 188 B.R. 778, 798 (Bankr. M.D.N.C. 1995). These factors include "the capital structure of the reorganized [d]ebtors, their projected earning power, economic conditions, management's ability and likelihood of continuing to work for the reorganized [d]ebtors, and any other factors relevant to the performance of the [p]lan." *Id.* (citing *In re Polytherm Industries, Inc.,* 33 Bankr. 823 (W.D. Wis. 1983)).

Based on these and other factors, the Court finds that the Plan is not feasible. Since the filing of this case, the Debtor has had difficulty meeting its monthly projections and has not generated sales that would support the projections provided for in the Plan. Therefore, further reorganization would be likely to follow.

The Court has concerns that no corroborating evidence was offered by the Debtor as to the additional sources of income. The Plan provides no information regarding the leased properties. The Debtor failed to provide copies of any current leases, any proposed draft agreements, or

projected rental income. Furthermore, there has been no evidence, beyond the testimony of Mr. Woodhouse, that Currituck County was, in fact, considering the possibility of zoning to allow a laundromat and the procedures necessary for the issuance of such permit. Although Mr. Woodhouse believes he would be receiving the permit on behalf of the Debtor, mere speculation is insufficient given that there has no been no testimony as to the projected opening schedules, location, costs of operations, permitting concerns and other issues that may arise. Mr. Woodhouse stated that the Debtor would likely be able to lease or lease to own the equipment from "Tommy Arney." However, Mr. Arney was not subpoenaed to testify as to his involvement with the laundromat.

Furthermore, the Court has serious concerns about the relationship between Laredo's and the Debtor. Mr. Woodhouse initially stated that he had a power of attorney from Mr. Arney to allow Mr. Woodhouse to operate Laredo's. Subsequently, during questioning, Mr. Woodhouse stated that he could obtain such a document from Mr. Arney to establish that he, in fact, operates and controls Laredo's. However, no documents or testimony were presented to the Court that could verify this statement.

Mr. Woodhouse testified that he had been working with a representative from PAPCO Oil. This relationship is critical to the Debtor, as the Plan relies upon profits generated from the sales of gasoline and fuel. However, the Debtor failed to present any specifics regarding a proposed contract, the cost of gasoline and diesel fuel, the basic terms of the relationship, or whether advance deposits would be required. Without this information, the Court is unable to determine if the portion of the projections related to the sale of fuel are realistic. The Court recognizes that businesses may not want to enter into contracts with a debtor that does not have a confirmed plan of reorganization. However, minimal information such as the testimony that Mr. Woodhouse discussed the possible

relationship with "Lance" is insufficient to satisfy the Court that this relationship is, in fact, ready to move forward upon confirmation.

In addition, the Debtor's projections for the slower, winter months substantially exceed the actual revenues generated during June and July when the sales of fireworks and tourist souvenirs are at a peak. The basis of the winter month projections are unclear, yet the Court was able to discern from the testimony that a portion of the projections was based on the speculative PAPCO Oil relationship.

Therefore, based on the reasons set forth above, the Debtor has failed to satisfy its burden that its Plan is, in fact, feasible. The record is remiss of corroborating or documentary evidence outlining the specifics of the proposed changes to the Debtor's operations or to its funding opportunities.[7] The Debtor had ample opportunity to subpoena witnesses or introduce documentary evidence but failed to do so. Based on the statements of Mr. Woodhouse and the other evidence presented to the Court, the Plan is speculative at best and cannot be confirmed. The Court believes that the Plan is likely to be followed by a liquidation, or the need for further financial reorganization.

---

[7] The Plan and Disclosure Statement, filed on September 3, 2010, fails to provide any information regarding the possibility of the SBA loan, the possibility of the Debtor obtaining the necessary approvals to operate a laundromat, the existence of Laredo's and its relationship with the Debtor, or the possibility of additional gasoline and fuel service contracts.

Based on the foregoing, the confirmation of the Chapter 11 Plan of Reorganization and the Modification of Chapter 11 Plan of Reorganization is **DENIED.**[8]

**SO ORDERED.**

**END OF DOCUMENT**

---

[8]Also pending before the Court was the Motion to Convert or Dismiss this Chapter 11 Case to a Chapter 7 Case filed by the Bankruptcy Administrator pursuant to 11 U.S.C. § 1112(b). Based on the facts set forth above, the Court found on the record that there are no unusual circumstances that establish that conversion of this case is not in the best interest of creditors. Furthermore, cause exists to convert this case pursuant to 11 U.S.C. § 1112(b)(4)(A) in that there is a substantial or continuing loss to or diminution of the estate combined with the absence of a reasonable likelihood of rehabilitation. These facts also support a finding of cause under Section 1112(b)(4)(B) for gross mismanagement of the estate. Therefore, the case was converted to one under chapter 7 from the bench and the Order Converting the Case to a Chapter 7 was docketed on August 24, 2010.